IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NATIONAL STEEL CAR LIMITED,          )
                                     )
                                     )          No. 15 CV 3418
                                     )
             Plaintiff,              )
                                     )
vs.                                  )          Chicago, Illinois
                                     )
FREIGHTCAR AMERICA, INC.,            )          June 28, 2016
                                     )
             Defendant.              )          11:07 o'clock a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JAMES B. ZAGEL

For the Plaintiff:

          KIRKLAND & ELLIS LLP
          BY:  George William Foster
          300 North LaSalle Street
          Chicago, Illinois 60654
          (312) 862-2000

For the Defendant:

          WINSTON & STRAWN LLP
          BY:  Jonathan E. Retsky
               Brendan Francis Barker
          35 West Wacker Drive
          Chicago, Illinois 60601-9703
          (312) 558-7962

Court reporter:

          Blanca I. Lara, CSR, CP, RPR
          219 South Dearborn Street
          Room 2504
          Chicago, Illinois 60604
          (312) 435-5895

(Proceedings taken in open court:)

MR. LEAVELL:  Good morning, Your Honor.

Craig Leavell and Bill Foster for National Steel Car.

MR. LEFT SIDE:  Good morning, Your Honor.

Jonathan Retsky and Ivan Poullaos, Winston & Strawn, for defendant, FreightCar America.  With me today, I'd like to introduce you to the general counsel of FreightCar America, Ms. Georgia Vlamis.

MS. VLAMIS:  Good morning, Your Honor.

THE COURT:  I forgot who spoke last.

MR. LEAVELL:  I don't recall either, Judge, but they did file their surreply on Friday.  I'm happy to address that, if you would like to start there.

THE COURT:  Sure.

MR. LEAVELL:  So as we discussed on Friday, our position was that they withheld these key railcar designs to the last day of discovery.  And on Friday, they said they were going to file a surreply where they show that they brought these designs to our attention several months ago.

And they did bring some designs, but not the designs that are relevant to our contentions.  What they showed us were aggregate gondolas that we had already accused and we knew about, and then two old-fashioned mill gondola designs, which are not the mill gondola design that we addressed in our opening brief in Exhibit 15.  It's that new design that was in

existence in January -- or February of 2015. So before the lawsuit was even filed, that they withheld from us.

It's that design that we understood should've been provided when they told us they were going to tell us about all mill gondolas with the single piece floor and the arrangement of the supports; they withheld that.

And not only did they withhold it, but they tried to redact it. What we didn't submit with our motion was a copy of the redacted version of Exhibit 15 that they provided at the same time, on the last day of discovery. And we can hand that up to Your Honor. But they intentionally hid from us the information about the mill gondola design that spurred our motion.

The only reason we found out about it is, they forgot to redact another version of this document, and that's where we learned about this new mill gondola design, which is virtually identical of the accused aggregate gondolas.

So in response to their surreply, sure, they told us about some irrelevant designs that either haven't been sold or we have no evidence that they've been sold until the very last day of discovery, or they were old designs that are not relevant to our patents, or they're designs that we already accused in our compliant.

And so the fact that they claimed to have told us about the design that is the subject of our motion, this new

mill gondola design, is just flat out false.  And, in fact, they tried to hide it from us through redactions.

May I?

THE COURT:  Sure.

(Document tendered to the Court.)

MR. LEAVELL:  So what we're handing up to you now is confidential.  If it's going to get filed, it should be filed under seal, but it's FCA 8063, the first Bates number.  It's not the complete document.  We've included just the relevant portions that show where they redacted.

What that is is, it's a redacted version of Exhibit 15 to our original motion which bore production number FCA 7245.

And if you can see on that first page, in the unredacted version, which I can hand that up too, Judge.

(Brief pause).

MR. LEAVELL:  Oh, you have it.  Okay.

So in the unredacted version, on the first page, the second item down, the 52 foot mill gondola.  That's the design that spurred our motion to compel.

Two lines down is the 44 foot aggregate gondola, which is the aggregate gondola, which is the same that we have been accusing from the very beginning.

You can see on the redacted version, they redacted about everything but the aggregate gondola.

And this document is dated February 6th, 2015.  So

when they told us, in January of 2016, that they've given us all the designs that we were asking for, that was false. This document was almost a year old at that point and they didn't tell us about this. They didn't tell us about this design until the last day of discovery when they produced these two documents, one of which they forgot to redact and that's the only reason we learned about it.

MR. POULLAOS: So we set out a lot of this in our surreply, Your Honor, but I think it's important to understand the history of this dispute.

So what happened is that, at the very beginning of this case, they asked for production of all designs of all gondola cars. And we pushed back on that, but then they also asked for designs that were, quote, substantially similar to the aggregate gondola cars that they accused. They called those the black car and the gray car. And they said, give us everything that's substantially similar to that. And we said, what does that mean? We don't know what that means.

We had a meet-and-confer. And what was the result of that meet-and-confer was an agreement as to what exactly we would produce.

We would produce cars with certain combinations of features, that we all agreed on, that had been claimed in the patents. It's not all gondolas, and it's not all gondolas with a certain feature. It's certain combination of features.

And so what happened was that we produced designs of cars with the same wall to floor connection, for example, as one of the cars that they accused. We produced cars with what's called a mismatch between the side stakes, the reinforcements on the sides, and the reinforcements under the car. So a mismatch between those, combined with substantially flat floor. The bottom line being, that there are certain combination of features that we agreed to produce, and it's exactly what we produced.

And what we did was we produced what's called general arrangements. So it's a general arrangement, and we attached those to our motion. They're fairly complex drawings that show all the features of that car, to allow them to decide whether or not to accuse them of infringement.

They decided not to accuse those cars of infringement, Your Honor. And those are the types of cars that they're now accusing us of hiding.

The only reason these types of things are redacted is because they did not go ahead and accuse those cars. They didn't accuse them. They have the features, we produced those general arrangements with those features that they then decided not to accuse of infringement, that's the bottom line point here.

So now to trump up a charge to say that, oh, we've discovered these mill gondola cars that you say existed that we

didn't know about; they did know about them. That's the whole point, they knew about them and they affirmatively decided not to put them into their supplemental infringement contentions, then in their final infringement contentions. And so now, instead of asking us about them, they're claiming surprise.

Or in their amended complaint, they didn't put these cars into their amended complaint after they, you know, redid their complaint to accuse various other cars and offers for sale.

So to say that this is a different car, it's not. It's a mill gondola car. And it's a specific offer for sale to a company of a car that falls within the general arrangements of what we'd already produced to them. So it's not a different car.

And so that's the bottom line, Your Honor. They've decided not to accuse these types of cars. And, in fact, during a meet-and-confer on these types of documents, counsel actually represented to us:

We know they don't infringe. We know they don't infringe, but just give us everything and we'll confirm that they don't infringe.

We said: No, come on, enough is enough. This happened over 6 months ago now. You decided to not accuse them, you don't get to expand this case even while admitting to us that they do not infringe.

They don't infringe. And that's exactly what National Steel Car has done with its actions by not accusing them. They should not now be allowed to expand this case to cars that they've already decided -- already told us do not infringe, and that's our position, Your Honor.

MR. RETSKY: Your Honor, I was the one on the phone call with Mr. Leavell in this meet-and-confer. This is very surprising and largely academic.

He did represent to me, when he saw this document, that they confirmed that it is not an infringement. And he said, why don't you produce all the other specifications that you have, just so we can rule them out and, you know, understand that they're not part of the case.

So we're kind of a little confused here. I think this is just an academic argument either to harass or annoy, or an attempt to expand the case at this late juncture.

MR. LEAVELL: Your Honor, we've got another document we'd like to hand up to you.

This is like a comparison between the design that they'd provided at the very last day of discovery and the designs they produced earlier which we agree are not covered by our patents.

(Document tendered to the Court.)

MR. LEAVELL: The top design is the mill gondola that they hid from us until the very last day of discovery, the

bottom two designs are the mill gondolas that they've provided to us and identified back to us in January.

And the key differences, in terms of our patents, can be seen in the cross-sectional views.

On the top diagram, the vertical wall sits on top of the floor. It comes down and sits on top of the floor. That's the key part of our patent. That's something they've known about since the beginning of the case.

The bottom two designs, that we confirmed were not covered by our patent, have the walls falling below the side of the car and attached on the bottom of the car with bolts or rivets. The wall does not sit on the floor, the floor does not go under the wall.

These two designs that they've produced and identified for us in January do not infringe, but they're very, very different from the design that they sprung on us on the last day of discovery, which is virtually identical to the aggregate gondolas that are in our complaint. And this is exactly the type of car that we were asking for from the very beginning of the case.

They told us they had produced, and then they didn't, even though these documents existed at the time they told us they identified all those substantially similar cars. They hid this from us. It's a different design. They didn't disclose it to us. They disclosed to us the designs of the mill

gondolas that don't infringe and we didn't pursue those because they're not covered by our patents, but they hid the one that's relevant and that's what spurred our motion to compel.

MR. POULLAOS: Your Honor, first of all, this is something that really should've been handled at a meet-and-confer, because they're raising brand new arguments now that, really, I think we probably could've worked out ages ago instead of them filing a motion to compel on designs that we'd already produced.

I think it's important to understand what this type of document is that they attached to their motion. It's a specific offer for sale, and does not necessarily purport to contain a complete structure of what the car is going to be.

So you can see that, at the end of this document, they have some language here and then one page with -- I don't know, with three different aspects of the design, as compared to the much more detailed, what's called the general arrangement, off of which all other cars then are modeled, that we did produce to them which is extremely detailed.

And that's one example (indicating). I mean, they've got a lot of different other views, cross-sections, views from different parts of the car, a bill of cost -- a bill of material, sorry. It's much more inclusive.

And so for them to say that this is a different car is not correct. I think it's a misunderstanding of what the

document is supposed to represent. And that's why, again, I say, you know, they're raising these for the first time. I think this could've been easily worked through during an actual meet-and-confer. So nothing was hidden from them.

MR. LEAVELL: Your Honor, we thought we had met and conferred, and we thought they agreed to provide this stuff. They told us they were going to.

And, in fact, we can give you that letter dated December 3rd, 2015. I'll pass that up.

It's where they said they would give us documents like this one (indicating), and they didn't.

(Document tendered to the Court.)

MR. LEAVELL: We met and conferred. We thought we had it resolved, and they didn't produce what they told us they would during that meet-and-confer.

Here, I've got a copy.

MR. POULLAOS: I've got it. It's attached to your motion.

MR. LEAVELL: Right.

So this was submitted with our motion. And they say they'll provide general arrangements for gondolas with a one-piece floor and one or more crossmembers that terminated the location. That's what this is showing, in our Exhibit 15, that they produced on the last day of discovery, accidentally, because they forgot to redact it.

MR. POULLAOS: That is not a general arrangement, as I just explained. And again, this could've been easily handled in a meet-and-confer instead of running to the Court and accusing us of hiding things.

But this is a general arrangement (indicating). It's a much more detailed document. That's what we produced to them.

We produced two mill gondola designs, an Ore gondola design, some other aggregate gondola designs, and they chose not to accuse them of infringement because they don't infringe.

Apart from the fact that, as my partner just explained, they've also confirmed to us that this one doesn't infringe that they're accusing us of hiding (indicating).

So it's really -- this is not -- this is not a legitimate dispute. They're flinging mud, and I think it's time for this to stop. This case should not be expanded beyond what was decided and agreed between the parties at a meet-and-confer.

And after we produced exactly what we told them we would produce, they came back and said, are these the documents you told us you were going to produce? We said yes. They did not accuse them of infringement and we moved on from there. So to have this all brought up again over six months later is not appropriate.

MR. LEAVELL: The only reason it came up six months

later is because that's when they finally gave us the documents that they said they would give us six months earlier.

And to clear up the record, this design is covered by our patent. Not all five patents, but some of the patents. We've never said that this design in our Exhibit 15 does not infringe.

MR. RETSKY: That's not correct, Your Honor.

(Brief pause)

THE COURT: Anything else you want to say on this issue?

MR. LEAVELL: No. Although, in light of the redactions, we don't know how many other designs are out there. So we want to make sure that our motion to compel is not just limited to this one document, which we already have one, and we'd like leave to amend our infringement contentions to assert infringement of this design, to the extent it's not already covered.

We did accuse all designs substantially similar to the two specific cars we identified. We think those infringement contentions already cover this design, but if they want to know exactly which claims we contend are infringed, we're happy to tell them that. But this is just one car, we don't know what else is out there in light of the redactions. They should produce all of the designs that are substantially similar to the accused designs.

MR. POULLAOS:  And, Your Honor, if you --

THE COURT:  Just a moment.

MR. POULLAOS:  Yes.

(Brief pause).

MR. LEAVELL:  And moreover, Your Honor, then we're going to need the financial discovery.  So we've asked financial discovery on sales information and marketing materials, and they've withheld all that on the substantially similar designs as well, presumably.

THE COURT:  You want to respond to that too?

MR. POULLAOS:  Yes, Your Honor.

Yeah, this goes back again to his substantially-similar language.  They're trying to use that as an excuse to say that they've accused everything under the sun. That was the whole point of the meet-and-confer back six months ago, "what do you mean by substantially similar?"  The parties came to an agreement, this is what we mean, the ones that have the actual combination of features that we agreed on.

And that's exactly what we produced.  Those are the general arrangements, the detailed drawings of those designs that we produced that they elected not to accuse of infringement.

And it's interesting to me, Your Honor, in their actual motion to compel, what they are saying is what they told us six months ago would be the way to move forward:

"Most efficient way to accomplish this ..." and I'm reading from their motion ".... is for FCA to first produce the technical specifications and drawings for its Mill and Ore Gondolas in order for NSC to confirm which designs are covered by the asserted patents and then move forward with further discovery."

That's what the parties were talking about six months ago, and what we agreed to do, and what we have done. They're back to square one, asking about these substantially similar cars, when we've already been around this block. We've had these discussions and we've produced the documents.

And these general arrangements are the Mill and Ore Gondolas that they're asking for. They elected not to accuse them and now they're attempting to expand this case again on cars they've already passed on.

MR. RETSKY: Your Honor, may I say one thing?

I've been leading this case for the last six months and I really am reacting to some of the statements that are coming out of plaintiff's counsel.

I can tell you, there is absolutely no intent to withhold anything here. They're accusing us of doing things on purpose, intentionally withholding things, hiding things. There's nothing that can be further from the truth, Your Honor. I am not aware of any attempts to withhold any documentation,

to hide things, or to refuse to disclose any documents in this case.

(Brief pause)

THE COURT: There's been significant emphasis on the motivation of the parties. And it's possible that one side is completely right and the other side is completely wrong, but the penalties that would come up, or be imposed, almost always is, and almost always has been, a secondary issue.

From my perspective, and I think most judges, is if somebody walks into a courtroom, as, for example, the plaintiff or the defendant here, talks about what they regard as, at the best for their opponent, a mistake, and it could be a lot worse, deliberately concealing something.

The fact is, no matter how serious the concealment is, if enough gets discovered in terms of issues about whether somebody fits into the correct drawer for designs, in the end, the significant part of the battle between the plaintiff and the defendant here, the significant part of that is is what exactly the analysis of the device is from the point of view of either side, that's where the real dispute is.

It is a perfectly understandable complaint if one side believes that they're getting this information on the very last day they're supposed to receive it, but the issue, from my perspective, is not that somebody may or may not have deliberately waited for the last day. It's an interesting

thing to deal with, but it's usually the second thing you deal with. The first thing you deal with is, whatever designs and programs are implicit in the device that is protected by patent law.

This has always struck me as the real issue. And it's probably pretty good for someone to have given this out (indicating), some time, someplace. I like it because, unlike much of patent law, I actually understand what they did here.

MR. LEAVELL: Sorry to interrupt, Judge, but just to be clear, we made that as a demonstrative just for the hearing. They didn't give us that.

THE COURT: Yeah. Yeah.

MR. LEAVELL: Okay.

THE COURT: If what the one purpose of this motion here has to do with the fact that doing what was done in the last day makes life difficult for the plaintiff, it's a trivial issue, because I can control the last day.

I can say, okay, well, I'm not ready to decide whether somebody did something maliciously or stupidly, and now they want to correct it, and somebody else possibly would say, well, you're a little too late, you got it on the last day. We're not dealing with that here.

And one very simple thing is is I could pick a time period and say, as of such-and-such a day they have 30 days left, or 60 days, or whatever it is, and that is the end of the

turnover period.

It may be, after all is said and done, it can be done in less time, which in this particular case it appears to me it could be in less time, but if it took a little longer, that's also okay.

So the first step of looking at this stuff, of what's produced and what hasn't been produced, is a decision made, in this case by the plaintiff, that this is what they have as material that is of value to them, demonstrating some breach.

But we don't have to go to what people's intent is yet. We can stop where the point is, somebody just, for example, doesn't give -- somebody puts something in the wrong envelope, we don't know if somebody puts something in the wrong envelope because they were careless or they did it perhaps deliberately to conceal something. I don't have to deal with those two polls yet. I may eventually have to deal with it, but I don't think we're going to get there.

So basically, I'm going to put us in a position where National Steel Car can say, we're changing our list of things that we had of breaches of various kinds. And the first step would be for National Steel Car to say, these are the things that were concealed from us. Or to make it simpler, these are what we didn't have, for whatever reason, and we've now taken a look at all of this stuff and we're changing our claim in one respect or another. Stuff may be put in, stuff may be taken

out, but they will be able to do that.

And then there can be a response by the defense which says, we don't think it makes any difference, we don't think it's material, we don't think it's something to deal with by comparison.

And you can make those arguments without talking about whether somebody did this maliciously or not.

So we can deal with the first stage as, it's a mistake. Not too sure whose mistake it was, but a mistake. We don't go any further than that until we get a list of what's actually on stage for this particular performance.

MR. RETSKY: May I respond to that, Your Honor?

THE COURT: Yeah.

MR. RETSKY: A couple of points.

One, as far as the intent part, which I appreciate and understand where Your Honor is coming from on that, but this is coming from a plaintiff who produced 46 percent of its entire document production after the close of discovery. We raised that with the Court. We never raised any mudslinging accusations of intent to sandbag or withhold. So I appreciate your understanding of that.

Secondly, procedurally, what we believe to be the right way to address this now is for the plaintiff to serve amended infringement contentions, specifically identifying now what they are adding to their list of accused products.

If Your Honor would allow that, we can put this case back in the stage where we are responding to those infringement allegations that are new and move forward from there.

MR. LEAVELL: That's what we're asking for, Judge, in our motion.

THE COURT: I think so too.

MR. LEAVELL: Except for, we still don't know whether we have all of them. If they can represent to us that we now have all the Mill and Ore Gondola designs specifications and detailed drawings, then we're ready to do that, but I suspect they're not willing to represent that.

THE COURT: Well, that leaves me to the second thing, and the second method that I've used can work, but for a variety of reasons, which will be clear to you, sometimes it's an easy remedy and sometimes it's almost impossible, which means that there's somebody in the world in which you work who can tell you, in a highly professional way without dealing with whose side is right and whose side is wrong, you can find somebody who knows this stuff, like they know everything in their lives.

The difficulty -- and this has sometimes worked with me: I hire a neutral expert. There's no disagreement about the neutrality of the expert, who answers a lot of these questions. And I've used that fairly often.

The problem with it is is that while using it fairly

often is true, it's not necessarily true that it's going to be a respectable and useful judgment, because you can get the outside expert in, often enough, and the outside expert does his or her very best, and everybody looks at it all very optimistic, and then the conclusions don't necessarily hold up to the facts.

But looking at something like this, I would assume is a decent chance that you would get some judgment from somebody familiar with the area, familiar with the practices, familiar with the use of a device, which I'm now holding up in my hand (indicating).

And that second step to take is to go to that possibility. You would have to essentially agree on who is a reliable and capable expert. And I would have to listen to whoever that expert is for a while, because I get some kind of idea what they're like when they're talking about stuff like this, and you can do that as well.

The reason I always put it in the second place is, in many cases -- "many cases," in some cases it doesn't work pretty well, but if it works decently and you have both the examination of these things and an outside expert who has not been told that there's been a fight over this, you might get some significant level of confirmation if you've got the expert who is looking also. It's just that it's not necessarily as reliable as one would wish, but it's out there.

MR. LEAVELL: May I respond to that, Your Honor?

THE COURT: Absolutely.

MR. LEAVELL: If I understand what you're saying is, the parties agree on an independent expert to come look at all of their designs and say which ones are substantially similar, which ones are not?

THE COURT: Right.

MR. LEAVELL: If that's what the Judge would like us to do, we're happy to do it, but I would suggest that a much more expedient way and more affordable way for all the parties to do it is, for them to make them available in a room. We don't need them to e-mail them to us if they don't want to, if they don't want to produce them, like we think they should have.

They make all their designs available for inspection, we can come. We have experts already in this case that know the designs, that know what they're looking for. They don't have to get up to speed. We can go to their office, we can bring our expert and say, these are the ones we're interested in, give us the information on those.

That's essentially what we asked for in our motion, but we're willing to modify that and say, instead of them producing it to us, if they really think that they're confidential or shouldn't be produced in copies, make them available for inspection, each design of each gondola car since

the patents issued. And we'll quickly go through them and say these are the ones. You know, the designs, the detailed drawings, and the specifications, the offers for sale, that's the material that we need to look at.

And we can quickly, probably within an hour or two, depending on how many there are, go through and find the ones that we think they should've produced before that are substantially similar. We would bear all cost, because it's our expert, and we wouldn't have to try to agree on an expert.

MR. RETSKY: Let me respond to that, Your Honor --

THE COURT: Wait a second.

The first thing in response is, I'd like to hear one of three words, although you might take all three: One is yes, the other is no, and there's a maybe. So this is what your opponent has put on the table.

MR. RETSKY: I'd say maybe is probably -- excuse me, yes and maybe.

Your Honor, as we tried to point out in our pleadings, the type of gondola that's been accused from the very beginning of this case is called an aggregate gondola. It's what the patents are directed to. It's a very unique type of gondola.

If the plaintiff wants to now -- and we've been proceeding and preparing our defenses all along, for a year now, related to that product line of categories.

FreightCar America makes lots of different types of

freight cars. "Gondolas" is a broad classification. Aggregate gondolas, if I may for a second, describe a certain type of a very lightweight car. And that's why they got the patents, on the types of features that you can make -- that you can design for a lightweight car, because you're pouring in sand or pea gravel. It's like their lead inventor said, it's like pouring sand into -- I mean, salt into a car. It's really easy. It's not destructive. It can take a lot of the structural integrity out of the car and make it very, very lightweight.

These other types of gondola cars, they're all called gondolas because they carry lading of some form, but they're different.

Ore Gondolas are designed to carry ore to a steel mill. That's a big chunk of stone. These types of cars tend to be much smaller because of the weight and much more structural reinforcement.

Same thing for mill gondolas. Mill gondolas take scrap. They throw in lots of different types of I-beams and other things. It's very destructive on the sides and floor of these cars. So there's much more structural integrity.

So the patents are directed to, how do you make a lightweight car. If we're going to do what plaintiff is proposing -- and we could be amendable to that. I really like to talk to my client for a second. I think what we're talking about is a wholesale expansion of this case. And Your Honor

has just agreed to extend the schedule for discovery because of the failures by the plaintiff with respect to the documents that they've produced, but if we're going to now start introducing other types of cars to this case, we need time to prepare our defenses. We need to understand, as I said a moment ago, specifically what the allegations are so that we can proceed from there.

So I think it's going to require some additional time and schedule, if Your Honor is open to that.

THE COURT: Just out of idle curiosity, any of this stuff carry lumber?

MR. LEAVELL: Those cars are not specifically designed for that. Usually a center beam car is used to carry lumber.

THE COURT: Yeah.

MR. LEAVELL: Presumably, you can throw anything in there.

THE COURT: My grandfather's lumber place, and when I was very little, that was one of the things that they would take me. A locomotive would come into the yard, and I remember crawling over lumbar. And I remember one of the people who gave birth to me screaming and yelling because I'd gotten pretty high up on the lumber and they weren't too sure that I knew how to get down. No, I remember these cars.

MR. LEAVELL: If I may, Your Honor.

THE COURT: Yeah.

MR. LEAVELL: We don't know what else is out there because we haven't seen it all. They seem to be concerned there's a whole lot of other designs that we're going to find that we think infringe our patents. If that's what they're concerned about, then I'm even more worried that there's more information we should've had.

If there's one design, if that's it, and that's the only design that we have to add infringement contentions for, that's a very small amount of additional infringement contentions. I don't think it's going to require an extension of the schedule, but I don't know.

If they've got 40 other designs that they're worried about showing us, then there may be, but for them to say that the case is limited to aggregate gondolas, our claims are not limited to aggregate gondolas.

The mill design that they produced in the last day of discovery is an example of a non-aggregate design, but from the looks of it, is covered by our patent.

So if it's just that design, then I don't think we need any extension, we can quickly get that done, but we don't know. And that's what we're asking is, just show us everything and we'll quickly look at it. And we'll know, then, whether there's more that should've been produced or whether this is a simple amendment of infringement contentions.

THE COURT: One of the reasons that I thought of

having an outside expert is, the expert gets a ton of stuff from your opponent, because, of course, what they're thinking of in the beginning is, their designs, their inventions, their changes, whatever they might be. And if you're dealing with an expert and he gets a lot of extra stuff, one of the things we can ask the expert about some of this stuff that your opponents are very concerned about. You could very well have an expert that says, this stuff that I've looked at is not relevant to your proposal. This is why I was talking about an expert, as opposed to talking about what's written in paper.

That's why I raised the expert issue, because my assumption was that, when you have the expert and what the expert knows is not necessarily forwarded on to the sides and it's something that has to be conferred with me to deal with. From my perspective, you're dealing with somebody skilled in the art, to the extent this is art, there is some level of reasonable protection, and the protection that's being performed is essentially the protection that what I have the plaintiff doing now.

And in the course of looking at all of this stuff that the expert looks at, if he's an expert or she is an expert and they understand this very well, they are likely to be able, without being asked, say, these particular things are not relevant, these particular things are not helpful.

And if you have an expert, a qualified expert, who is

willing or wants to take the position, which is, this stuff is out, this stuff is in, and then we have this little pile here. When that happens, my practice has been to confer with the expert, in my chambers, so I can understand what the expert's thinking is.

And in many cases, we could have a discussion involving counsel without necessarily having to disclose everything, because that's what the expert does for you, he says, this stuff is out of the box under any standard.

Now, the reason I also said that this is not necessarily a perfect solution is, there's room for error here. It's just that I think there will be less room for error with the expert.

And what also sometimes happen is, people are actually not settling the patent case, and there's a discussion with respect to that. Sometimes you wind up with another expert, sometimes you don't.

But the way this is presented to me now is, there's a lot of stuff out there, all kinds of beams and other things circling the earth. Okay, but as a practical matter, that's of no interest, will be of no interest to you. That's why you start out with exchanging information based on the positions I have adopted, and having the expert is something that helps.

And if it's not helping, and I will find out soon knew, then we won't be dealing with the expert. That's why I

start out with, talk amongst yourselves and then get an expert that both sides can agree on, and tell the experts. It's a good place to start.

MR. LEAVELL: Again, Judge, if that's what you want us to do, we can do it, but I'm envisioning a lot of inefficiencies with us, spending a lot of time trying to agree on an expert, and then bringing that expert up to speed as to what the relevant features are, and then both sides having to pay that expert's time at several-hundred-dollars per hour. We have an expert that's up to speed. I think they should've produced all this stuff at the very beginning of the case, so that we could all look at it and decide what to accuse. If they don't want to do that, fine. Make them available in a room and it'll take our expert five seconds to look at the documents and say yes, this is in or out. I don't know if there's ten of those documents or a hundred of those documents. So I don't know if it's five minutes or an hour, but it would be very efficient, we could do it --

THE COURT: And that can be done --

MR. RETSKY: Your Honor, can I comment on that?

THE COURT: Yeah.

MR. RETSKY: First of all, I just checked with my client, who is here, and said that we really like the idea of the expert, and I'll tell you why.

We've been down this path before. We started with a

complaint -- two complaints that accused only aggregate gondolas. They have been asking in discovery for what is substantially similar, even though they only specifically accused aggregate gondolas.

So we've gone around in circle about this and attempted to work with them previously. We thought we were complying. We gave them the documents and they never pursued the matter. So to go back and do that again seems unproductive. I think the expert idea is a good idea.

Essentially what my colleague is proposing is, we would go, put in a room every design of every freight car made and then they get to go ahead and pick and choose what they think is infringing or not.

They need to have a Rule 11 basis, I think, to be able to accuse a product of infringement. And essentially what they're asking for is a fishing expedition to go through all of our technical specifications for all the types of cars we made and make a decision of what they want to now add to the case.

THE COURT: Which is something that they would very much like to do, but one of the purposes of the expert is to close some of those doors.

MR. RETSKY: Right. And that's why I think the expert does makes sense and we agree to it.

MS. VLAMIS: Right.

MR. LEAVELL: I don't know why it can't be our expert.

I mean, he's go the same duties to testify truthfully and to make the right calls.

THE COURT: But it never works that way. Once you go down that path and you're throwing canon balls at each other, you're going to have to have some kind of referee, and the referee is going to know the rules better than you do.

And the problem that sometimes happens with the referee, they make errors, but they are less likely to make errors because they are employed by some particular person, and I think that that's why that works.

There is nothing wrong with sitting down with your opposition and saying, well, we know more than we used to know because of these various drawings they've given us. And you may very well wind up agreeing on some points here or there. But listening to you reading the papers, I do not believe that either side is completely trusting of the other, which is why I like to have the expert who gets the money equally from both sides and will, before we actually deploy that -- "deploy" is the wrong word. After that expert is deployed, and I've seen what's happened, I may make a conclusion that it hasn't actually helped, but most of the time it does, and at least it helps somewhat. And sometimes, because the expert knows a lot about these cars, these gondolas, that expert will probably be educating me, to some significant extent, and we'll go that way.

And there's also nothing wrong than sitting down initially on stuff that both sides are willing to look at without needing an expert to do it, but it's my conclusion, my feeling right now, which, of course, could be wrong but I doubt it, that expert flying around the coop a little is a safeguard probably for you and almost certainly for me.  That's where I am with that.

MR. LEAVELL:  Okay.  As long as we can do it quickly so that we're not extending the case out unnecessarily.  We're happy to give that a try.  But I know that our expert could do it in one afternoon as soon as they make the documents available.

THE COURT:  Which is fine.  And your opponent can probably hire the other born twin --

MR. LEAVELL:  And they have their experts as well.

THE COURT:  Yeah.

MR. LEAVELL:  And we're happy to let their experts sit in the room while our expert --

THE COURT:  Right.

MR. LEAVELL:  -- does his --

THE COURT:  Right.  But I want the one who's reporting to me.  So that's where I am with this.

MR. LEAVELL:  (Nodding).

MR. RETSKY:  (Nodding).

THE COURT:  So you can discuss this and tell me how

you want to do it and then we'll go ahead.

MR. LEAVELL: Okay. And, Your Honor, if we're finished with this point, I've got another question for you, an unrelated point.

THE COURT: Okay. Well, I will tell you, as I was looking at this, I was reminded of my experience with this as I got older, but to tell you the truth, there's nothing like the engine, climbing up those steps; terrific.

MR. RETSKY: We know how engines are.

MS. VLAMIS: (Nodding).

THE COURT: You were going to something?

MR. LEAVELL: Judge, with respect to the order you issued on Friday, that their motion for leave to exceed 25 prior art references was moot, I just want to understand the rationale for that order.

Because if you have determined that they're win 25 prior art references and that's why you denied the motion as moot, then we'll proceed accordingly, but I don't want that to be the order just because they said you could deny the motion as moot, because there are other issues --

THE COURT: It was denied as moot because I thought something else would be done in its stead, and I spent a lot of time thinking about what that might be and you know now what it is.

MR. LEAVELL: Okay. So we've got leave to file

motions for --

THE COURT: Right. You're not locked in.

MR. LEAVELL: Okay.

THE COURT: And your opponent isn't locked in either.

MR. LEAVELL: Okay. Well, then, Judge, we'll quickly prepare a motion to strike, then, and explain exactly which references we think should be stricken --

THE COURT: Swell.

MR. LEAVELL: -- as untimely or exceeding 25. Thank you, Judge.

THE COURT: Okay?

MR. RETSKY: There are other points to their motion. I don't know if counsel is prepared to or wants to, or if the Court wants to entertain it. There's nothing further from the defense side.

MR. LEAVELL: That's a good point. Good reminder.

There are other things we've asked for in our motion to compel. We're happy to discuss those, but you focused on the other types of railcars.

THE COURT: Yeah.

MR. LEAVELL: If you'd like to hear on the other ones, we can but the --

THE COURT: Yeah, but you can do that later. You can do that later, unless it's something that has to be done right away.

MR. LEAVELL: Well, the FEA analysis documents, I think it's the second point in our motion to compel, that is pretty time-sensitive, because we want our expert to start working with those materials and using them and analyzing them in connection with the ongoing discovery and the anticipated expert reports.

The related documents on the prosecution history on their provisional application, my goes is that there are no such documents yet, but we'd still like you to grant the motion so that, as those applications get prosecuted and more documents are submitted to the Patent Office, they're under an obligation to make sure those are produced.

So the fact -- I'm guessing that they just haven't prosecuted --

THE COURT: Stop.

Do you care?

MR. RETSKY: Well, yeah, I have a couple of points to respond to there, Your Honor, if I may.

Let me take them in order on how he raised them. There's the FEA analysis -- or the FEA data files, from what I understand. We have produced an FEA analysis document to them. What they're asking for now is the underlying data so that they can give it to their experts and they can run all sorts of simulations, et cetera.

The one thing we're concerned about is, we're not

objecting to the experts. This is very, very highly sensitive data that we're talking about here. We're concerned because these experts work in the field, there's inevitable disclosure that they're going to get highly sensitive information from our client that might make its way out into the industry.

The real issue, though, is, all the plaintiff has said, it's going to cost them, quote/unquote, significant time and money. What we've never received or understand is, what is it going to cost.

They haven't provided an estimate. They've alleged that it's going to be some exorbitant amount of money. We have no idea. So I think it'll be appropriate to understand just how much we're dealing with here. It would protect my clients significantly if they were going to go ahead and pay for the recreation of this data, which they say they can do. And it's not imminent, it's not like it's needed tomorrow.

THE COURT: He's asking you to do it later.

MR. LEAVELL: Well --

THE COURT: That's basically what it amounts to.

MR. LEAVELL: Well --

THE COURT: With a possible "if at all" after it.

MR. LEAVELL: And I don't think that's appropriate, Judge. Discovery is open. We get it during discovery. We should've had it before discovery closed the first time.

But this is -- you know, expert reports are going to

be due at some point, and the experts are consulting with us in connection with analysis, claim reconstruction, a lot of aspects of the case. So I don't see what purpose it serves to wait for it later when this is relevant now.

As far as the cost concern, I don't have the exact numbers, but my recollection was, when we asked an expert whether he could recreate this FEA analysis from the drawings that they have provided, it was hundreds of hours, several months, and a couple hundred thousand dollars in cost. That's ridiculous for us to go through all that process when they've got the file sitting there.

These experts are already bound by the protective order. They've signed and agreed not to use the information for anything other than this litigation. And the force of this Court will come down upon them if they do, they understand that. We can make additional, more explicit provisions in connection with this data. We can limit it to one copy, we could keep it secured in our office. Whatever you need to do to make it even more secure, we're happy to do.

But for us to spend several months and hundreds of hours, and hundreds of thousands of dollars to try to recreate simulations, and then for their expert to say, well, no, they're wrong because they did it differently, when they've got the data right there, seems unnecessary.

MR. RETSKY: I can't fathom how it's going to cost

that much money, Your Honor.  These experts that we've hired in this field are relatively inexpensive for patent experts.  Hundreds of thousands of dollars, I really do question that.

Given the fact the plaintiff has filed this case, they brought this action, this is very highly sensitive information, my client is telling me it's critical that we try to protect this.  It's not unreasonable for me to ask for a real estimate in writing.

THE COURT:  We'll hold another hearing on that particular question, but the stuff that I started with at this hearing ought to come first.

MR. RETSKY:  Understood, Your Honor.

I will just briefly address the request for the remaining patent filing material.  So we, in our motion, produced a provisional patent application that was specifically identified, I think we said in our papers, somehow it dropped in our meet-and-confer process.  We produced that.  We were not trying to withhold anything there.

Now they're coming back and asking for more information and they're pointing to an RFP number 79 that was served which calls for all documents filed with the U.S. PTO in any patent application that makes reference to a gondola.

So first of all, that's extraordinarily broad, and again, ties into this attempt to find whatever else they can find that they can accuse of infringement.

But more importantly, they're talking about documents filed, and they provide two patent numbers. Well, I think, as the Court knows, the prosecution history for a patent, once its issued, is publicly available. You can get it at USPTO.gov.

So both of these patents, and their file histories, have been available for more than 15 years. These are old patents. Plaintiff can get this stuff publicly. I don't even understand why they're asking for us to produce copies. They can readily download it from the Internet. We produced the provisional patent application that they identified, that's not publicly available, and I understand, and that's why we produced it.

Lastly, they identify what they call FCA's proposed invention described as, quote/unquote, "gondola car with intervening side sills and stub side sill." This comes out of an e-mail that we produced in discovery. I have followed up with both the head of engineering, and the patent attorney, this application was never filed. It was listed as a potential patent application, but nothing ever came of it. So there's nothing to produce there.

So at the end of the day, I think we've given them everything they've asked for that they can, otherwise, get publicly.

MR. LEAVELL: Your Honor, we don't need them to give us publicly-available information. Here's the facts, they

filed a provisional application with the U.S. Patent and Trademark Office. If you go to the Patent and Trademark Office website, you get a result that says, that's not available, it's not available. They did give us a copy of that application. Then, they have another application, a PCT application, an international application, that claims priority to that provisional application. And if you go to the European Patent Office website, you can get the records that have been filed in Europe. But what we don't have and what we don't know is, if and when that document triggers the U.S. prosecution. So the PCT is identified in the United States as one of the countries, and eventually the Patent Office will start prosecuting that patent application and it will still be shielded. Eventually it will be public, but we don't know when. And I don't know whether they've already started that process or whether that process will begin down the road, but that's the information that we'd like them to turn over, ones that exists, if it exists. If they're willing to do that, then I think the issue is resolved.

MR. RETSKY: I'm not exactly sure what he's asking for, but I think we can meet-and-confer on this and not take up the Court's time.

THE COURT: Yeah, I think you can too. I think you can, too.

Anything else?

MR. LEAVELL: No, Your Honor, although -- could we meet-and-confer right now?

THE COURT: Yeah.

MR. LEAVELL: Okay.

So what is it you don't understand?

This doesn't need to be on the record.

(Whereupon, there was a conference had between counsel.)

MR. RETSKY: Why don't we do this outside of the court. I don't think --

THE COURT: No, you actually can do it in this courtroom. I may not be here.

MR. RETSKY: Okay. We don't need to take up anymore of Your Honor's time.

THE COURT: The other thing is, at this particular moment in time, I'd be willing to entertain your presence here more frequently than we ordinarily would do.

MR. RETSKY: I'm sorry, I didn't hear that.

THE COURT: If you got -- between the two of you, if you got some problems and some difficulties, I am not adverse to hearing you coming in on fairly short notice on one issue. It's better that way, once you start rolling.

MR. RETSKY: I think we've been working pretty well together but --

THE COURT: Well, except you'll roll even faster if

you come and see me.

MR. RETSKY: Okay. Thank you, Your Honor. Appreciate that.

THE COURT: Thank you.

MR. POULLAOS: Thank you, Your Honor.

MR. LEAVELL: Thank you.

(Which concluded the proceedings had on this date in the above entitled cause.)

*    *    *    *    *    *    *    *

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

/s/Blanca I. Lara                    October 12, 2017